UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN HOULAHAN,

                              Plaintiff,

         v.

RAPTOR TRADING SYSTEMS, INC.,

                              Defendant.

**MEMORANDUM
OPINION & ORDER**

16 Civ. 9620 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff John Houlahan is the former Chief Operations Officer ("COO") of Omex Systems, LLC ("Omex"). Omex and Raptor Trading Systems, LLC ("Raptor") merged in 2015, and Houlahan – pursuant to a January 2015 written employment agreement (the "Employment Agrement") – became the COO of the merged entity, also called Raptor. Pursuant to the Employment Agreement, Plaintiff is entitled to two percent of the profits earned if Raptor is sold, and to severance payments in the event that he is fired. Houlahan was fired on August 9, 2016, about a year and a half after he entered into the Employment Agreement, and about four months after Raptor signed a letter of intent regarding the sale of the company. In this action, Houlahan claims that Raptor breached the Employment Agreement by not paying him severance.

The Complaint was filed on December 13, 2016, and asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing; and for declaratory relief. As to the breach of contract claim, Plaintiff argues that Raptor breached the Employment Agreement by not paying him severance. As to the good faith and fair dealing claim, Plaintiff contends that Raptor fired him in order to escape its obligation to pay him a percentage of the profits if Raptor were sold. As to his claim for declaratory relief, Plaintiff seeks, inter alia, a

declaration that if Raptor is sold, it must pay him two percent of the profits from the sale. (Cmplt. (Dkt. No. 1)).

In a February 12, 2018 order, this Court granted Defendant's motion to dismiss Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and for declaratory relief.  (Order (Dkt. No. 40))  The Court conducted a bench trial concerning Plaintiff's breach of contract claim on June 17-18, 2019.  Neither side filed post-trial submissions.  (See June 20, 2019 Ltr. (Dkt. No. 72))

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## **FINDINGS OF FACT**

The Employment Agreement

1. Plaintiff Houlahan has worked in the financial services, trading, and e-commerce industries for 30 years.  (PX 21 (Houlahan Decl. ¶ 2)  He was hired as the COO of Omex, a financial services software enterprise, in 2011.  (Id. ¶ 4))

2. In September 2014, Houlahan – on behalf of Omex – began negotiating with Raptor about Raptor's potential acquisition of, or merger with, Omex.  (Id. ¶ 8)

3. As a purchase or merger seemed increasingly likely, "negotiations over [Houlahan's] employment agreement began in earnest."  (Id. ¶ 9)

4. In January 2015, Houlahan and Raptor entered into an Executive Employment Agreement. (Id. ¶ 19; PX 4 (Employment Agmt.)  The Employment Agreement has a two-year term, and expires on December 31, 2017.  (PX 4 (Employment Agmt. ¶ 2)

5. The Employment Agreement states that Raptor "intends [to] purchase Omex Systems, LLC . . . and merge said company into Raptor," and that Raptor "wishes to employ [Houlahan] as

its Chief Operations Officer of the eventual successor entity to OMEX LLC, and in the interim, as director of the OMEX-Raptor . . . business unit resulting from the merger." (Id. (recitals))

6. The Employment Agreement further provides that Houlahan will "serve as director of the 'OMEX-Raptor' business unit resulting from the merger . . . until such time as the OMEX business unit is positioned as a stand-alone company," at which point Houlahan would become the Chief Operations Officer of Omex LLC and report to "the Chief Executive Officer of Raptor." (Id. ¶ 3(a))

7. The Employment Agreement provides that Houlahan will receive a base salary of $170,000; it states that his salary will increase to $220,000 when the new unit's revenues equal or exceed its expenses; and sets conditions for bonus eligibility. (Id. ¶ 4) The Employment Agreement further provides that – "[a]s an inducement to become and remain an employee" – Houlahan will "be entitled to receive the equivalent of two percent (2%) of the net profit from the sale of the OMEX-Raptor business unit or its successor company." (Id. ¶ 4(d))

8. Pursuant to the Employment Agreement, Houlahan is "an at-will employee," and "subject only to the terms of th[e] Agreement," "[his] employment [could] be terminated for any reason or no reason and at any time. . . ." (Id. ¶ 5)

9. The Employment Agreement provides that "[i[f [Houlahan's] employment is terminated by the Employer without Cause . . . [Houlahan] will be entitled to," inter alia, "(i) any Base Salary earned but not yet paid; (ii) continuation of the Base Salary (the '**Severance Payments**'), at the rate in effect on the date of [Houlahan's] termination of employment . . . for a period of nine (9) months (increasing to twelve (12) months after the Initial Terms of Employment) from the date of termination (the '**Severance Period**'); (iii) reimbursement . . .

of any business expenses incurred by [Houlahan] . . . but not yet paid to him . . .”; [and] (iv) other compensation or Benefits accrued and earned. . . .”  (Id. ¶ 6(c) (emphasis in original)) The Employment Agreement further provides that “[a]ny amounts due under this Section 6 are in the nature of severance payments or liquidated damages or both, and will fully compensate [Houlahan] . . . for any and all direct damages and consequential damages that [he] may suffer as a result of lawful termination of [his] employment.”  (Id. ¶ 6(d) (emphasis in original))

10. The Employment Agreement sets conditions for Houlahan’s receipt of severance payments following termination.  “In order to receive any of the Severance Payments, prior to the payment of such amounts, [Houlahan must] execute and agree to be bound by a release of claims in the form substantially similar to the form attached here as **Exhibit A** within sixty (60) days after the date of termination.”  The Employment Agreement further provides that “[t]he Employer shall tender the release of claims to [Houlahan] within fifteen (15) days following the date of [Houlahan’s] termination of employment, and, upon any failure of the Employer to so tender such release within such time period, [Houlahan’s] obligation to provide such release in order to receive the Severance Payments shall cease to apply.”  (Id. (emphasis in original))

11. “Exhibit A” to the Employment Agreement is a “Separation Agreement and Release” (the “Initial Separation Agreement”).  The Initial Separation Agreement, inter alia, would release Raptor “from any and all actions, causes of action, suits, debts, claims, complaints, charges, contracts, controversies, agreements, promises, damages, counterclaims, cross-claims, claims for contribution and/or indemnity, claims for costs and/or attorneys’ fees, judgments and demands whatsoever, in law or equity, known or unknown, Employee ever had, now has, or

4

may have. . . ."  (Id., Ex. A, ¶ 3)  The Initial Separation Agreement provides that each party

"shall bear its own costs and attorneys' fees, if any, incurred in connection with this

Agreement and Release (id., Ex. A, ¶ 13); contains a New York choice of law provision (id.,

Ex. A, ¶ 17); and gives the Employee 45 days to execute the document once it is presented by

the Employer.  (Id., Ex. A, ¶ 15).[1]

12. The Initial Separation Agreement contains blanks for Houlahan's separation date, the amount

of severance he is owed, and the deadline for his receipt of the severance payment.  (See id.,

Ex. A, ¶¶ 1, 2, and recitals)

13. In February 2015, Omex and Raptor executed formal transaction documents pursuant to

which Omex merged with Raptor, and Raptor became the surviving entity.  Omex never

operated as a separate business unit; all Omex employees, including Houlahan, became

employees of Raptor.  (PX 21 (Houlahan Decl.) ¶ 31)

14. The Employment Agreement provided that Houlahan would report to Raptor's Chief

Executive Officer (see PX 4 (Employment Agmt.) ¶ 3(a)), who was Teddy Lardos.  (See

Trial Tr. at 18)

Houlahan's Employment at Raptor

15. From the outset of his employment at Raptor, Houlahan's relationship with Lardos was poor.

Soon after Houlahan began working at Raptor, two Raptor Board members, Mark Hinman

and Nelson Ignacio, asked Houlahan "to put together an honest assessment of Raptor."

Houlahan did so, and sent a "Raptor Road Map" to the Board on May 4, 2015  (PX 21

---

[1]  The 45-day limit, when considered together with the 15-day period Raptor had under the
Employment Agreement to provide Houlahan with an appropriate separation agreement and
release, is consistent with the Employment Agreement's 60-day period, following termination,
for Houlahan to execute a release.  (PX 4 (Employment Agmt.) ¶ 6(d))

(Houlahan Decl.) ¶¶ 32-33; PX 6 (May 4, 2015 emails))  Although other Board members had

a positive reaction to Houlahan's assessment (see id. ¶ 34), Lardos was displeased.  He sent

the following email to Houlahan less than fifteen minutes after receiving the Road Map: "NO

GOOD.  I am very upset at you.  Do not go to the board ever again without checking with me

1st.  Your mandate is IT and only IT. . . ."[2]  (PX 7 (May 4, 2015 Lardos emails) at 1)

16. Other Board members told Houlahan that he reported to the Board, and not to Lardos.  (See
    PX 21 (Houlahan Decl.) ¶ 37; PX 8 (May 5, 2015 Hinman emails) ("[Y]ou are correct that
    you report to the board, not Teddy."); Trial Tr. at 44, 180-81)

17. In December 2015, Raptor hired Harun Karadenizli as its Head of Products and Services and
    demoted Houlahan to Head of Omex Product, where he once again reported to Lardos.  (See
    PX 21 (Houlahan Decl.) ¶ 39; PX 9 (Dec. 11, 2015 Ginsburg email))

18. Houlahan claims that Raptor denied him a bonus – but awarded bonuses to other employees
    – and did not raise his base salary in accordance with the Employment Agreement.  (PX 21
    (Houlahan Decl.) ¶ 40; Trial Tr. at 52-53)

19. By this time, Houlahan's relationship with Lardos was "[r]ocky."  (Trial Tr. at 51)

20. Believing that Raptor had breached the Employment Agreement, Houlahan gave notice of
    termination to the Board in January or February of 2016.  He reached an agreement with
    Hinman, Ignacio, and Bruce Ginsburg, Raptor's Human Resources Director, whereby
    Houlahan would receive part of his bonus, and would report to Karadenizli rather than
    Lardos.  (Trial Tr. at 168-73)  This change was formalized in a May 2016 "restructuring."
    (See PX 10 (May 3, 2016 Ginsburg email); Trial Tr. at 174-75)

---

[2] Lardos later apologized to Houlahan for his email.  (See Trial Tr. at 43)

21. On April 22, 2016, Raptor and another company, Iress, entered into a non-binding Letter of Intent, which contemplated that Iress would acquire Raptor for $32 million.  (PX 22 (Gil Decl.) ¶ 12; DX B (Apr. 22, 2016 Iress Proposal to Acquire Raptor))

22. Houlahan saw the letter of intent at some point in May or June 2016; Hinman and Ignacio also informed Houlahan of the potential transaction that summer.  (Trial Tr. 60-64)

23. By the summer of 2016, Raptor's general counsel, Alejandro Gil, had learned from the Raptor Board that Houlahan's job was in jeopardy.  Lardos, in particular, was unhappy with Houlahan's job performance.  (PX 22 (Gil Decl.) ¶ 23; Trial Tr. at 228-29)

24. Gil's office was next to Houlahan's office, and the two men had a good relationship.  In May or June 2016, Gil communicated to Houlahan the Board's and Lardos's concerns about his job performance.  (Trial Tr. at 231)  Houlahan responded that, if he were fired, he would be entitled pursuant to the Employment Agreement to two percent of the profits stemming from Raptor's sale to Iress, which would total $640,000.  According to Gil, Houlahan stated that if he did not receive the promised two percent, he would sue, citing ongoing and disruptive litigation between Raptor and Omex's former CEO and COO, Michael Wallach and David Beth.[3]  (Id. at 231-32; PX 22 (Gil Decl.) ¶¶ 24, 60, 64, 67)

Houlahan's Termination

25. In early August 2016, Lardos informed Gil that Houlahan was going to be fired, and instructed Gil to prepare and present Houlahan with a termination letter.  (PX 22 (Gil Decl.) ¶ 25; Trial Tr. at 234)

26. According to Gil, "[t]he standard practice was for [Raptor's] director of human resources" – Bruce Ginsburg – "to handle the . . . exit interview or the handover of any [termination-

_____

[3] Houlahan denies threatening litigation before his termination.  (See Trial Tr. at 94)

related] papers or documents."  (Trial Tr. at 238)  Gil sometimes handled the termination of

contract and high-level employees, however.  In any event, Ginsburg was on vacation on

August 9, 2016, the date selected for Houlahan's termination.  Accordingly, Gil was assigned

to handle the termination.  (See Trial Tr. at 239-40, 244)

27. On the morning of August 9, 2016, Gil prepared a termination letter for Houlahan (the "Gil

Letter").  He did not consult with anyone about the contents of the letter.  (PX 22 (Gil Decl.)

¶ 27; Trial Tr. at 251-52)  Gil decided that when he spoke to Houlahan, he would give him

only the Gil Letter and a copy of the Initial Separation Agreement, and would not provide

any information about the salary and benefits to which Houlahan would be entitled as

severance.  As of the morning of August 9, 2016, Gil did not have the severance information,

and he expected that Ginsburg would later provide it to Houlahan.  Accordingly, the Initial

Separation Agreement contained blank spaces where Houlahan's severance was referenced.

Gil did not consult with anyone about providing Houlahan with an Initial Separation

Agreement that contained blank spaces.  (Trial Tr. at 239-40, 242)

28. After preparing the Gil Letter, Gil asked Houlahan to come to his office.  Gil told Houlahan

that he was being terminated, and handed him the Gil Letter and the Initial Separation

Agreement.  Houlahan "quickly glanced at the documents and told . . . Gil that [he] needed

[his] attorney to review them before [he] could sign them."  (PX 21 (Houlahan Decl.) ¶ 50;

see also Trial Tr. at 163)  He then asked Gil for time to clean out his office.  Gil agreed, but

asked Houlahan to return the documents so that – when Houlahan finished cleaning out his

office – Gil could have a witness present when he provided Houlahan with the documents.

(PX 21 (Houlahan Decl.) ¶ 52; see also Trial Tr. at 89-92)

29. After this initial meeting with Houlahan, Gil stopped by Karadenizli's desk, told him that he
was going to fire Houlahan that day, and asked him to attend the meeting at which Houlahan
would be terminated, because he wanted a witness present in case Houlahan brought a
lawsuit.  (Karadenizli Decl. (Dkt. No. 56) ¶¶ 3-4; Trial Tr. at 196-97)  Gil handed
Karadenizli the Gil Letter and the Initial Separation Agreement, and told him that he would
be giving Houlahan these documents during their meeting.  (Karadenizli Decl. (Dkt. No. 56)
¶ 5; Trial Tr. at 204-05)  Karadenizli read the first page of the Gil Letter, and merely
"glimpsed through" the Initial Separation Agreement.  (Trial Tr. at 207-08)

30. At 1:09 p.m., before Gil and Karadenizli met with Houlahan, Gil received an email from
Nelson Ignacio with the subject line "JH paperwork."  The email includes three attachments:
Word documents entitled "JH Sep Leter A"; JH Sep Leter B"; and "JH sep."  The first two
documents are two versions of a termination letter, and the remaining document is a
separation agreement.  (PX 17 (Aug. 9, 2016 1:09 p.m. Ignacio email); Trial Tr. at 272)  Both
versions of the termination letter bear the typewritten signature of Bruce Ginsburg, Raptor's
Director of Human Resources, and both versions state that August 9, 2016 is Houlahan's last
work day at Raptor.  Both versions of the termination letter provide information about, <u>inter</u>
<u>alia</u>, Houlahan's final paycheck, 401(k) plan, health and dental insurance, health savings
account and pre-tax deferrals, paid leave, and unemployment compensation.  Both letters also
incorrectly state (1) the end dates for such benefits, listing dates in 2015 rather than in 2016;
and (2) that Houlahan had an outstanding $22,500 loan[4] against his 401(k) account that
needed to be repaid upon termination.  The first letter references a separation agreement that
Raptor is "pleased [Houlahan] chose to sign," and describes the severance package Raptor is

---

[4] "[L]ess two payments made on 10/30."  (PX 17 (Aug. 9, 2016 Ignacio email) at 4, 6)

offering (PX 17 (Aug. 9, 2016 1:09 p.m. Ignacio email) at 3), whereas the second letter

makes no mention of any separation agreement or severance pay.

31. At 1:13 p.m. Gil received a second e-mail from Ignacio that reads: "Please see corrections to

termination date and benefits and dates." (PX 18 (Aug. 9, 2016 1:13 p.m. Ignacio email);

Trial Tr. at 280-81) This email attaches the same two versions of the termination letter,

except that in the new versions most of the inaccurate references to 2015 are corrected. The

attached separation agreement is identical to the version attached to the 1:09 p.m. email.

32. Gil received a third email from Ignacio at 1:27 p.m. (See PX 19 (Aug. 9, 2016 1:27 p.m.

Ignacio email)) This email states "Removed sections on outstanding 401k loan amounts" (id.

at 1), and attaches only the two versions of the termination letter. These versions of the

termination letter do not reference a $22,500 loan taken from Houlahan's 401(k) account.

33. At approximately 3:10 p.m. Gil, now with Karadenizli, summoned Houlahan to his office.

(Trial Tr. at 100; Karadenizli Decl. ¶ 7) At this meeting, Gil handed Houlahan two sets of

documents: the Gil Letter, with the Initial Separation Agreement attached, and the version of

the termination letter Ignacio had e-mailed at 1:09 p.m. (the "Ginsburg Letter") with the

separation agreement Ignacio had e-mailed (the "August 9, 2016 Separation Agreement")

attached.[5]

---

[5] Houlahan testified that his first meeting with Gil took place at about 1:00 or 1:30 in the
afternoon (See Trial Tr. at 84-85), whereas Gil and Karadenizli testified that Gil provided
Houlahan with the Gil Letter and the Initial Separation Agreement in the morning. (Trial Tr. at
201-02, 208, 212, 239, 299) The Court concludes that there were two meetings with Houlahan
and that the initial meeting between Gil and Houlahan took place in the morning. At trial, Gil
provided a cogent account of the sequence of events and why it was necessary to have two
meetings with Houlahan.

Houlahan also testified that, at the first meeting, Gil handed him the Gil Letter and the Initial
Separation Agreement as well as an additional letter and a different separation agreement (the
Ginsburg Letter and the August 9, 2016 Separation Agreement). Given Houlahan's admission

34. The August 9, 2016 Gil Letter states:

> Raptor is hereby providing to you notice of the termination of your employment agreement entered into on January 15, 2015 (the ['Employment] Agreement') with Raptor, effective today.  Together with this cover letter you will receive a statement of benefits letter detailing final payroll, Cobra, 401K related information and other benefits related disclosures.  You will also receive Raptor's standard separation agreement.  The terms of this standard separation agreement are supplemental to [your Employment Agreement] and shall apply to you only to the extent that they do not conflict with the terms of [that Employment] Agreement.

> Per the terms of the [Employment] Agreement, . . . in order to receive "Severance Payments" . . . you are required to execute "within sixty (60) days after the date of termination . . . a release form "substantially similar" to the form attached to the [Employment] Agreement as "Exhibit A" (executed copy of Exhibit A is annexed hereto).

> Raptor shall have no obligation to pay to you the scheduled [severance] payments unless and until the form is received by Raptor. . . .

---

that he "quickly glanced at the documents" during his initial meeting with Gil (see PX 21 (Houlahan Decl.) ¶ 50), this Court concludes that Houlahan's testimony about what documents he received at the initial meeting with Gil is not reliable, and that he is simply assuming that he received the same documents at both meetings.

There is also conflicting testimony regarding the documents that Houlahan was given at the 3:10 p.m. meeting. In Karadenizli's declaration, he asserts that "[a]t the [3:10 p.m.] meeting, Mr. Gil handed to Mr. Houlahan the same papers that [Gil] had provided to [Harendizli] earlier" – namely, the Gil Letter and the Initial Separation Agreement.  (Harendizli Decl. (Dkt. No. 56) ¶ 8) When questioned by the Court at trial, however, Harendizli admitted that he only saw the first page of the documents Gil handed to Houlahan, and that he "ha[s] no idea what documents Mr. Gil handed to Mr. Houlahan" at the 3:10 p.m. meeting.  (See Trial Tr. at 212-13)  Meanwhile in Gil's declaration, he states that he does not recall providing the Ginsburg Letter to Houlahan on August 9, 2016.  (See PX 22 (Gil Decl.) ¶ 39)  In his declaration, however, Gil also acknowledges that he "cannot state with certainty whether or not [he] gave Mr. Houlahan the Ginsburg [L]etter and the accompanying [August 9, 2016] [S]eparation [A]greement" at any time on August 9, 2016, and that "it is certainly possible that [he] . . . provided [these documents] to Mr. Houlahan" at the 3:10 p.m. meeting.  (See id. ¶¶ 47, 56)

This Court concludes that Gil did in fact provide the Ginsburg Letter and the August 9, 2016 Separation Agreement to Houlahan at the 3:10 p.m. meeting.  This conclusion is supported by the fact that (1) Gil received three e-mails from Ignacio – in quick succession – shortly before the 3:10 p.m. meeting, and these emails contain versions of these two documents; and (2) "despite a full, thorough, and exhaustive search of documents in its custody, possession, and control," Raptor has not been able to locate or identify any subsequent correspondence in which, or occasion at which, the Ginsburg Letter and the August 9, 2016 Separation Agreement were provided to Houlahan.  (See Joint Pretrial Order (Dkt. No. 50) at 5)

(PX 11 (Aug. 9, 2016 Gil Letter))

35. The August 9, 2016 Ginsburg Letter states:

> We are pleased that you chose to sign the Separation Agreement, effective this date.  The purpose of this letter is to reiterate to you the details concerning your transition out of Raptor Trading Systems, Inc. (Raptor), including the status of your benefits. . . .
>
> It is expected that as of today, August 9, 2016, you will comply with all the requirements of the Separation Agreement.  Failure to do so will cause Raptor to withdraw the severance offer.  Please refer to the Separation Agreement to make sure there is no misunderstanding as to your responsibilities.

(Aug. 9, 2016 Ginsburg Letter (PX 12) at 1)  The Ginsburg Letter further states that the total

severance owed to Houlahan is $127,500.12, and supplies information about Houlahan's other

benefits.  (Id. at 1-3)  As noted above, this version of the Ginsburg Letter contains inaccurate

termination-of-benefits dates and inaccurate information about a loan Houlahan had purportedly

taken from his 401(k) account.  (Id.)

36. Although the August 9, 2016 Ginsburg Letter bears Ginsburg's typewritten signature, he had

no involvement in the creation of the Ginsburg Letter.  Indeed, Ginsburg was on a cruise at

the time.  (See Joint Pretrial Order (Dkt. No. 50) at 5; PX 22 (Gil Decl.) ¶ 43)

37. The August 9, 2016 Separation Agreement was attached to the Ginsburg Letter provided to

Houlahan during the 3:10 p.m. meeting.  (See n.5, supra)  The August 9, 2016 Separation

Agreement – like the Initial Separation Agreement – includes a release form.  The release

form that is part of the August 9, 2016 Separation Agreement provides for the "irrevocabl[e]

and unconditional[] release[] [of] . . . any and all actions and causes of actions, assertions,

cases, claims, and rights to payment or equitable remedy . . . whatsoever . . . that the

Employee . . . ever had or now has against Raptor, or which the Employee hereafter can, will

or may have against Raptor, for or by reason of any cause, matter, thing, omission,

occurrence or event whatsoever from the date of Employee's birth through the Termination

12

Date." (PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 9)  The release form states that Employee

will, by signing the form, release Raptor from, inter alia, "damages of any kind that could be

awarded in conjunction with the foregoing or any statutory, common law or other Claims at

law or equity. . . ."  (Id. at 10)

38. The terms of the August 9, 2016 Separation Agreement differ from those of the Initial

Separation Agreement in many respects:

    a.   The August 9, 2016 Separation Agreement contains a "VOLUNTARY
TERMINATION" subheading providing that "[Houlahan] submitted and
Raptor accepted [Houlahan's] voluntary resignation . . . effective Tuesday,
August 9, 2016[.]"  See PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 4 (emphasis in
original).  The Initial Separation Agreement does not refer to a voluntary
resignation (PX 4, Ex. A) and it is undisputed that Houlahan did not
voluntarily resign.

    b.   The August 9, 2016 Separation Agreement contains a Maryland choice of law
provision and forum selection clause (PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at
6), whereas the Initial Separation Agreement contains a New York choice of
law provision and does not contain a forum selection clause.  (PX 4, Ex. A, ¶¶
11, 17)

    c.   The August 9, 2016 Separation Agreement contains a joint waiver of jury trial
(PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 6), while the Initial Separation
Agreement contains no such waiver.  (PX 4, Ex. A)

    d.   Pursuant to the August 9, 2016 Separation Agreement, Houlahan has one
week to execute the document (see PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 7
("THIS AGREEMENT WILL AUTOMATICALLY EXPIRE AND BE OF
NO FORCE OR EFFECT UNLESS BOTH THE EMPLOYEE AND
RAPTOR EXECUTE AND DELIVER THIS AGREEMENT ON OR
BEFORE 3:00 PM ON AUGUST 16, 2016") (emphasis in original)), whereas
the Employment Agreement provides that Houlahan has 60 days from the date
of termination to execute the document, see PX 4 (Employment Agmt.) ¶
6(d)); the Initial Separation Agreement provides that Houlahan has 45 days
from the date of termination to execute the document.  See id. Ex. A, ¶ 15).

    e.   The August 9, 2016 Separation Agreement lists as a condition precedent to
payment of severance that Houlahan "first repay to Raptor the amount of any
. . . advances previously made . . . which remain outstanding."  (PX 12 (Aug.
9, 2016 Ginsburg Ltr.) at 5)  No such condition is found in the Initial
Separation Agreement.  See PX 4, Ex. A.

    f.   The August 9, 2016 Separation Agreement provides that if Houlahan breaches the agreement, he will have to "repay to Raptor all sums paid to him under this Agreement together with . . . attorneys' fees and costs incurred to collect those monies and/or to seek injunctive relief."  (PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 6.   The Initial Separation Agreement contains no such provision.  See PX 4, Ex. A.

    g.   The August 9, 2016 Separation Agreement states that a non-compete provision found in the Employment Agreement remains binding on Houlahan PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 6.  The Initial Separation Agreement contains no such provision.  See PX 4, Ex. A.

39. The parties agree that the August 9, 2016 Separation Agreement is not substantially similar to the Initial Separation Agreement.  See Joint Pretrial Order (Dkt. No. 50) at 5.

40. The August 9, 2016 Separation Agreement contains the following merger clause:

> This Agreement includes all Recitals, attachments, exhibits and schedules, and contains the entire agreement of the parties regarding the termination of the Employee's employment by Raptor.  It may not be changed orally but only by agreement in a writing signed by the party against whom enforcement of any amendment, waiver, change, modification, extension or discharge is sought.

(PX 12 (Aug. 9, 2016 Ginsburg Ltr.) at 7)

41. Gil maintains that he "specifically advised Mr. Houlahan that he was required only to sign the [Initial Separation Agreement] and not the [August 9, 2016 Separation Agreement] referenced in the [August 9, 2016 Gil Letter] in order to receive his severance."  Gil says that he also told Houlahan that he had to execute the Initial Separation Agreement within the time frame specified in the Employment Agreement.  (PX 22 (Gil Decl.) ¶ 37)  Karadenizli similarly asserts that Gil told Houlahan that he had 60 days to sign the papers he was given on August 9, 2016.  (Karadenizli Decl. (Dkt. No. 56) ¶ 9; Trial Tr. at 215, 218)  Houlahan's testimony indicates, however, that there was no such conversation.  He describes a "three minute" encounter in which he took the documents that Gil handed him, gave Gil his building access card and office keys, and left.  (See, e.g., Trial Tr. at 101, 109; PX 21

Houlahan Decl.) ¶ 57)  Houlahan immediately notified his attorney of his termination, and

that same day he gave his attorney a copy of the documents he had received from Gil.

Houlahan retained a copy of these documents for himself.  (PX 21 (Houlahan Decl.) ¶¶ 58-

59)

42. After his afternoon meeting with Houlahan, Gil sent the following email to Raptor's board of

directors:

> All, please be advised that at approximately 3:30 p.m. today Raptor Trading Systems[]
> terminated the employment agreement it had with John W. Houlahan.  In the presence of
> Harun [Karadenizli] I served him with the termination notice letter and the various standard
> Raptor separation documents including the form of release that is Exhibit A to his
> employment agreement and which you must sign in order to receive the benefits detailed in
> his employment agreement.

(PX 20 (Aug. 9, 2016 Gil email))[6]

43. At 3:55 p.m. on August 9, 2016, Karadenizli sent a company-wide email "announc[ing] the

departure [of] John Houlahan as an employee of Raptor Trading Systems."  (PX 16 (Aug. 9,

2016 Karadenizli email))

44. On August 16, 2016 — the deadline for Houlahan to sign the August 9, 2016 Separation

Agreement – Houlahan called Bruce Ginsburg and requested an extension.  (See PX 13 (Aug.

16, 2016 Ginsburg email); Trial Tr. at 134, 165-66)  Ginsburg emailed Houlahan later that

day, telling him to "please note that with respect to deadlines for executing a release, you

should be guided by your employment agreement [and its 60-day period]. . . . I recall that

Alex [Gil's] letter to you on the day your contract was terminated made reference to the

---

[6]  Gil acknowledged at trial that his reference in this email to "standard Raptor separation
documents" "would arguably indicate" that he gave Houlahan the Ginsburg Letter and August 9,
2016 Separation Agreement at their afternoon meeting.  (See Trial Tr. at 306)  When the Court
asked Gil whether it was possible he had provided these documents to Houlahan, Gil stated:  "I
agree, your Honor.  There were so many drafts floating around, it's possible.  It's possible.  And
I may simply – I may have done it and simply forgotten about it."  (Id. at 306-07)

specific section in your [Employment Agreement] where the deadline is detailed.  Please refer to [the Gil Letter] and [the Employment Agreement].  The deadlines contained in Raptor's [August 9, 2016 Separation Agreement], to the extent that they conflict with the deadlines in your [E]mployment [A]greement, should be disregarded."  (PX 13 (Aug. 16, 2016 Ginsburg email))

45. A day or two after his termination, Houlahan – for the first time – read carefully the documents Gil had given him on August 9, 2016.  Houlahan noticed the numerous differences between the Initial Separation Agreement and the August 9, 2016 Separation Agreement.  (See PX 21 (Houlahan Decl.) ¶¶ 60-70)

46. On December 13, 2016 – about four months after his termination – Houlahan filed the instant lawsuit against Raptor.  (See Cmplt. (Dkt. No. 1))

47. To date, Houlahan has not signed any separation agreement with Raptor, and Raptor has not paid any severance to Houlahan.  (Trial Tr. at 106-07; Joint Pretrial Order (Dkt. No. 50) at 5)

## CONCLUSIONS OF LAW

As noted above, the sole claim tried before this Court was breach of contract: Plaintiff contends that Raptor breached the Employment Agreement by not (1) not providing him with a separation agreement substantially similar to the Initial Separation Agreement; and (2) paying him severance.  He seeks $127,500.12 in severance pay, along with interest, costs, and attorneys' fees.

## I.   WHETHER RAPTOR BREACHED THE EMPLOYMENT AGREEMENT

"Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4)

16

damages.'"  First Inv'rs Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)

(quoting Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994)).

        As discussed above, the Court concludes that during Houlahan's August 9, 2016

afternoon meeting with Gil and Karadenizli, Gil provided Houlahan with both the Initial

Separation Agreement and the August 9, 2016 Separation Agreement.  Moreover, given the

language used in the Gil Letter and in Bruce Ginsburg's August 16, 2016 email to Houlahan, the

Court further concludes that it was the August 9, 2016 Separation Agreement that Raptor

intended and required Houlahan to sign.

        For example, the Gil Letter states that Houlahan, per his Employment Agreement,

is "required to execute . . . a release form 'substantially similar' to [that in] the [Initial Separation

Agreement, which is] . . . annexed hereto," and further states that Houlahan is receiving

"[t]ogether with this cover letter . . . a statement of benefits . . . [and] Raptor's standard

separation agreement."  (PX 11 (Aug. 9, 2016 Gil Ltr.))  The Gil Letter does not state or suggest

that Houlahan could simply sign the separation agreement "annexed hereto"; if Houlahan were

expected to sign the Initial Separation Agreement attached to the Gil Letter, there would be no

reason to say that Houlahan "will receive Raptor's standard separation agreement."  The

evidence shows that the "Raptor[] standard separation agreement" referenced in the Gil Letter is

the August 9, 2016 Separation Agreement.  The Gil Letter's reference to Houlahan signing a

"substantially similar" release form – rather than the release form attached to the Gil Letter –

further demonstrates that Gil is referring to a separate document.

        Ginsburg's August 16, 2016 email to Houlahan confirms this understanding.  (PX

13 (Aug. 16, 2016 Ginsburg email)  While Ginsburg tells Houlahan that he can "disregard[]" the

deadlines in the August 9, 2016 Separation Agreement, Ginsburg otherwise contemplates that

Houlahan will sign the August 9, 2016 Separation Agreement, and not the Initial Separation Agreement.[7]

That Raptor intended to require Houlahan to sign the August 9, 2016 Separation Agreement is also demonstrated by the fact that the copy of the Initial Separation Agreement attached to the Gil Letter could not – as Gil concedes (see Trial Tr. at 247-50, 253-54, 261 (quoting deposition testimony)) – ever have constituted an enforceable contract, because it did not contain the most essential term:  the amount of Houlahan's severance.[8]  See Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 372 (2d Cir. 2003) ("'Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties.  If there is no meeting of the minds on all essential terms, there is no contract.  This is because an enforceable contract requires mutual assent to the essential terms and conditions thereof.'" (quoting Schurr v. Austin Galleries of Ill., 719 F.2d 571, 576 (2d Cir. 1983)); Time, Inc. v. Kastner, 972 F. Supp. 236, 239 (S.D.N.Y. 1997) ("[W]here a contract does not have such essential terms as the time or manner of performance or price to be paid, the contract is unenforceable."); cf. Kolchins v. Evolution Mkts., Inc., 128 A.D.3d 47, 59 (1st Dept. 2015) (finding that salary and bonus were among the "material terms of the employment contract"), aff'd, 31 N.Y.3d 100 (2018).

---

[7]  That Houlahan called Ginsburg on the day of the deadline for execution set forth in the August 9, 2016 Separation Agreement suggests that Houlahan likewise understood that it was the August 9, 2016 Separation Agreement that he was required to sign.

[8]  In Raptor's Pretrial Memorandum, Raptor "concede[d] that there were blanks that had to be filled in" on the Initial Separation Agreement.  (Def. Pretrial Br. (Dkt. No. 52) at 9)  That Houlahan could have obtained this information from Raptor's Human Resources Department – as Raptor argues (id.) – is of no moment.  It was Raptor's obligation to provide him with this information in the Initial Separation Agreement if Raptor intended that this document become an enforceable contract.

As discussed above, it is undisputed that the August 9, 2016 Separation Agreement that Raptor required Houlahan to sign is not "substantially similar" to the Initial Separation Agreement referenced in the Employment Agreement.  (Joint Pretrial Order (Dkt. No. 50) at 5)  Accordingly, by insisting that Houlahan sign the August 9, 2016 Separation Agreement, Raptor breached the Employment Agreement.  (See PX 4 (Employment Agmt.) ¶ 6(d) ("In order to receive any of the severance payments [owed] . . . [Houlahan] shall execute and agree to be bound by a release of claims in the form substantially similar to the [Initial Separation Agreement]."))

Raptor argues, however, that Houlahan's breach claim fails, because he has not "establish[ed] that he was ready[,] willing and able to perform."  (Def. Pretrial Br. (Dkt. No. 52) at 11)  According to Raptor, Houlahan "was simply unwilling" to sign a separation agreement, "because [doing so] would extinguish his claim for $640,000.  He rolled the dice and bet on a more favorable outcome . . . the amount of his severance plus additional amounts based [on] his perceived entitlement under the 2% provision."  (Id. at 9)  This argument is not persuasive.

Raptor relies primarily on Pesa v. Yoma Dev. Grp., Inc., 18 N.Y.3d 527, 532 (2012).  (Id. at 11-12)  In Pesa, the New York Court of Appeals held that where a seller anticipatorily breaches, or repudiates, real estate contracts, "non-repudiating buyers [must] show their readiness, willingness, and ability to perform."  Pesa, 18 N.Y.3d at 532; see also Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990) ("A plaintiff may recover for anticipatory breach [under New York law] if it can show (1) that the defendant insisted upon terms which are not contained in a contract, . . . and (2) that the plaintiff was ready, willing, and able to perform its own obligations under the contract when performance was due." (citations and bracket omitted)); 13 Lord, Williston on Contracts § 39:41 (4th ed.) ("[T]here is

authority holding that the party claiming an anticipatory repudiation . . . must show that but for the repudiation, it would have been ready, willing, and able to perform its obligations under the contract, at least when . . . the repudiating party[] places in issue the ability of the plaintiff to perform."). This line of authority is of no assistance to Raptor.

As an initial matter, <u>Pesa</u> and similar authorities address anticipatory breach, and this case does not involve an anticipatory breach, whether by Raptor or Houlahan. "An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract . . . for performance has arrived." <u>Princes Point LLC v. Muss Dev. L.L.C.</u>, 30 N.Y.3d 127, 133 (2017) (internal quotation marks and citation omitted); <u>see</u> <u>Lucente v. Int'l Bus. Machines Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002) ("Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares an intention not to fulfill a contractual duty.").

Here, Raptor breached its obligation to provide Houlahan with a separation agreement that complied with the Employment Agreement. It is mere speculation for Raptor to argue that Houlahan would have never signed a separation agreement that did comply with the Employment Agreement. Raptor has likewise cited no authority suggesting that the "ready, willing, and able" doctrine applies outside of the context of anticipatory breach.

Finally, the Employment Agreement tells us what the consequences are of Raptor's failure to provide Houlahan with an appropriate separation agreement and release. The Employment Agreement requires Houlahan to execute "a release of claims in the form substantially similar to" the Initial Separation Agreement, and further provides that Raptor "shall tender the release of claims to [Houlahan] within fifteen (15) days following the date of [Houlahan's] termination of employment, and, <u>upon any failure of the Employer to so tender</u>

20

such release within such time period, [Houlahan's] obligation to provide such release in order to receive the Severance Payments shall cease to apply." (PX 4 (Employment Agmt.) ¶ 6(d) (emphasis added))

In sum, the parties set forth in the Employment Agreement what the consequences would be of Raptor's failure to provide Houlahan with a substantially similar separation agreement and release: the consequences are that Houlahan need not execute a release in order to obtain his severance. In other words, Houlahan need not perform. Therefore, even if the "ready, willing, and able" doctrine had some application here, the parties contracted around any such requirement.

In any event, Houlahan testified at trial that he was willing to sign an appropriate separation agreement and release (see Trial Tr. at 123-24), and there is no evidence to the contrary.[9]

For the reasons stated above, the Court concludes that Raptor breached the Employment Agreement, and that Houlahan is entitled to $127,500.12 – the severance pay he is owed – plus pre-judgment interest.

## II.   PLAINTIFF'S CLAIM FOR ATTORNEYS' FEES

Under the so-called "American Rule," "the cost of attorneys' fees is not ordinarily shifted onto the losing party." U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 171 (2d Cir. 1996). Pursuant to this "bedrock

---

[9] This Court rejected Raptor's effort to introduce settlement discussions concerning this issue, concluding that this proposed evidence was barred by Fed. R. Evid. 408. (June 14, 2019 Conf. Tr. at 5-8, 14); see also Def. Pretrial Br. (Dkt. No. 52) at 10 (describing such communications); Def. Proposed Findings of Fact and Conclusions of Law (Dkt. No. 53) ¶¶ 46-49 (same); Def. Opp. Br. (Dkt. No. 64) at 4-5, 8-10 (opposing Plaintiff's motion in limine seeking preclusion of settlement communications).

principle," "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract

provides otherwise." Baker Botts L.L.P. v. ASARCO LLC, __ U.S. __, 135 S. Ct. 2158, 2164

(2015) (internal quotation marks and citation omitted).  The Supreme Court "ha[s] recognized

departures from the American Rule only in 'specific and explicit provisions for the allowance of

attorneys' fees under selected statutes,'" id. (quoting Alyeska Pipeline Serv. Co. v. Wilderness

Soc'y, 421 U.S. 240, 260 (1975)).

       Houlahan argues, however, that he is entitled to an award of attorneys' fees

pursuant to Fed. R. Civ. P. 37(c)(2). (See Pltf. Pretrial Br. (Dkt. No. 51) at 13-14)  Rule 37(c)(2)

provides that "[i]f a party fails to admit what is requested under Rule 36 [governing requests for

admission] and if the requesting party later proves . . . the matter true, the requesting party may

move that the party who failed to admit pay the reasonable expenses, including attorney's fees,

incurred in making that proof."  Fed. R. Civ. P. 37(c)(2).

       Where a court finds that a party has refused to admit a matter for which the other

party has requested admission and the other party proves that matter is true, "[t]he court must . . .

order" the non-admitting party to pay the other party's fees "unless:  (A) the request was held

objectionable under Rule 36(a); (B) the admission sought was of no substantial importance; (C)

the party failing to admit had a reasonable ground to believe that it might prevail on the matter;

or (D) there was other good reason for the failure to admit."  Fed. R. Civ. P. 37(c)(2).  "[T]he

true test under Rule 37(c)[(2)] is not whether a party prevailed at trial," however, "but whether

[the non-admitting party] acted reasonably in believing that he might prevail."  Fed. R. Civ. P.

37, Advisory Comm. Notes to the 1970 Amendment.  Moreover, "[t]he expenses that may be

awarded under Rule 37(c)(2) are only those that could have been avoided by the admission."

Guzik v. Albright, No. 16cv2257(JPO)(DF), 2019 WL 1448358, at *4 (S.D.N.Y. Feb. 8, 2019).

Houlahan's Rule 37(c)(2) argument is predicated on Raptor's response to Plaintiff's request that Raptor admit that "Raptor did not tell Mr. Houlahan or any representative of Mr. Houlahan that he could receive his severance if he signed the Initial Settlement Agreement." Raptor denied this request to admit, stating that "Mr. Houlahan was told this at a meeting that occurred on August 9, 2016. In attendance were Alejandro Gil, Harun Karadenizli and John Houlahan." (Pltf. Pretrial Br. (Dkt. No. 51) at 14) Plaintiff's argument on this point is not persuasive.

Here, Raptor had reason to believe that it might prevail on the issue of whether Houlahan was told that he could obtain his severance by merely signing the Initial Separation Agreement. Gil testified that he "specifically advised Mr. Houlahan," during their August 9, 2016 afternoon meeting, "that he was required only to sign the [Initial Separation Agreement] and not the [August 9, 2016 Separation Agreement] referenced in the [Gil Letter] in order to receive his severance." (PX 22 (Gil Decl.) ¶ 37) While this Court has concluded – for the reasons stated above – that Raptor insisted that Houlahan sign a separation agreement that did not comply with the Employment Agreement, Houlahan has not shown that it was unreasonable for Raptor to believe that this Court would accept Gil's testimony as to what was said by Gil during the August 9, 2016 afternoon meeting.

Houlahan has also not shown that the attorneys' fees he seeks "could have been avoided by the admission." Guzik, 2019 WL 1448358, at *4. Raptor has defended this case primarily on the theory that Houlahan was not "ready, willing, and able" to sign any release. (See Def. Pretrial Br. (Dkt. No. 52) at 10-11 ("There is only one legal issue in this case and it squarely addresses the exact factual issue at trial. . . . Houlahan must establish that he was ready[,] willing and able to perform before he can recover damages. That inquiry is the central

23

issue of fact."); Trial Tr. at 14-15 (Defense Opening) ("Had [Houlahan] signed the release . . . his

claim for $640,000 [the 2% profits] would have evaporated.  So what did he do?  . . .  [He]

decided that [his severance] wasn't going to be enough.  He leveraged his position.  He took a

gamble . . . .  And that's why we are here.").  Accordingly, Raptor's defense at trial did not turn

on whether Gil told Houlahan that he could obtain his severance by signing the Initial Separation

Agreement.

     Houlahan is not entitled to an award of attorneys' fees pursuant to Fed. R. Civ. P.

37(c)(2).

**<u>CONCLUSION</u>**

     For the reasons stated above, Defendant Raptor is liable for breach of contract,

and Plaintiff Houlahan is entitled to $127,500.12, plus pre-judgment interest.  The Clerk of Court

will enter judgment and close this case.

Dated:  New York, New York
   May 30, 2020

              SO ORDERED.

              _____

              Paul G. Gardephe
              United States District Judge